UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PATRICK SCOTT BEARDMORE, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:13-CV-361 |
| | § | |
| JAMES  JACOBSON, | § | |
| | § | |
| Defendant. | § | |

## CORRECTED OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

An Opinion and Order on Defendant's Motion for Summary Judgment, Doc. 40, was filed September 16, 2015.  After finding a clerical error in the opinion, the Court now files a corrected opinion.  Having considered the motions, supplements, response, replies, the facts in the record, and the applicable law, the Court concludes Defendant's Motion for Summary Judgment should be granted.

I.    **Background**

This is a dispute over the ownership of the "Z.E.A.L. Rewards App" ("Zeal," the "App"), an iPhone application. The dispute arose during negotiations over the management structure of Z.E.A.L. Rewards, LLC, which was intended to own and manage the App. The record contains inconsistent testimony as to who owns what part of the App and the LLC, and what exactly the App comprises.

The undisputed facts are as follows. Plaintiff Beardmore and Defendant Jacobsen have been family friends for 35 years. Jacobsen invested in Beardmore's first company, Eternal Publishing, which published a religious comic-book series that was adapted into an iPhone app.

In 2010, Beardmore and Plaintiff Galen Blom started a company to develop an iPhone app for local community events, outsourcing the software programming to Chris Reichard of Stratopy LLC. In 2011 or early 2012, Beardmore began designing Zeal, a "loyalty rewards app" patterned on frequent-shopper cards or paper punch cards, which allows shoppers to record purchases at participating stores and receive free items. Doc. 29-3 at 106–07 (describing Zeal as "buy 7, get 1 free"). Beardmore designed Zeal with the assistance of Blom, who contributed "diagramming, wire framing, assembling, and a lot of feedback of functionality to the app, a lot of brainstorming in the initial creation process." In return, Blom was awarded 5% of the business. Doc. 40-1 at 32, 35. Beardmore hired Reichard to write code for the App in exchange for 5% of the business. *Id.* at 27.

On May 9, 2012, Beardmore emailed Jacobsen a 19-page "pitch deck" including approximately 1,000 words summarizing the App and a disclaimer ("By receipt of these materials, you and your representatives acknowledge the for[e]going and agree not to disclose the contents or substance of these materials to any third party without prior consent of Zeal Rewards.") and copyright notice ("Copyright 2012 Patrick Scott"). Doc. 42-1 at 1, 4. The document describes Beardmore as "President & CEO of ZealRewards.com." *Id.* at 17. It includes seven screenshots and one page entitled "The Competitive Advantage" describing in general terms the way the App works:

> It is fun to be rewarded loyalty points that can be redeemed for gift cards of your chose [sic] before any single punch card is filled. Users are in control!
> It is fun to play and compete to win rewards / recognition for being one of the top seven (7) Zeal users in a community, (Zealots are ranked by points accumulated each month).
> Each month Zeal awards gift cards to the top seven (7) Zealots in each community based on their cumulative loyalty rewards points;
> (1st $25; 2nd $20; 3rd $1; 4th $10; 5th -7th $5)
> It is fun to express your personality through your own customized game skin and avatars.

Doc. 42-1 at 12.   On May 11, 2012, Jacobsen emailed Beardmore a letter of intent, stating:

> I think the following outlines what I could move forward with fairly quickly.
>
> 1. $50,000 Commitment in exchange for 20% equity ownership. This is straight common equity ownership and will be identical in terms with you.
>
> 2. Not to complicate matters with a checking account I etc. I will pay all expenses from my personal checking account till I hit the $50,000. If additional funds are needed, we can review at a later date after we see how things progress towards the identified goals and objectives.
>
> 3. I will pay 50% of your fees for the 3 development projects we discussed earlier today immediately with the remaining 50% paid upon completion of each project. And you[r] salary will start immediately on the 15th of each month for the $2K.

Doc. 43-3. Beardmore replied, "This is acceptable. On the condition that if we need capital to grow we all agree to an equal dilution to raise additional funds." Doc. 40-2. On the same day, Jacobsen wrote Beardmore a check for $48,000, which Beardmore deposited in his personal checking account. Doc. 40-1 at 32, 83. Beardmore testified:

> May 12th, the first day he agreed to fund the Pitch Deck, and I picked up a check from him . . . . I said, "I'll be the president and CEO," and I said, "Galen will do the marketing, and Chris will build the app, and we'll set up a company." And he said, "We'll set up the LLC stuff later." He said, "That's fine." And I said, "All right. Great."

Doc. 40-1 at 83. Beardmore spent the $48,000 on living expenses, as well as promotional materials. *Id.* at 32 ("I created the Web site, created the business cards, created the fliers, created the folders."). Jacobsen paid Beardmore an additional $5,000 to develop two personal websites and $5,000 to pay Chris Reichard to program a second app called "Trip Mine." *Id.* at 33. Beardmore testified Jacobsen agreed to contribute $50,000 to develop Trip Mine in return for an additional 25% of the business. *Id.* at 78 ("I agreed to match it and give him 45 in Zeal, so we'd have 45 together. They'd -- he'd have both 45 in both properties."). Jacobsen texted him, "So just to confirm what equity I have in zeal? 45?" Beardmore replied, "OK and yes 45%." *Id.*

Beardmore's testimony is ambiguous as to whether Jacobsen, Blom, and Reichard's shares were in the App, the business, an informal partnership, or a not-yet-formed LLC; whether they were granted by Beardmore himself; and whether they were transferred orally or in writing. *Id.* at 27 ("We had given -- I had given [Reichard] a position of equity in exchange for 50,000 dollars' worth of development time."); *id.* at 35 ("I would -- I believe I sent it to them in an e-mail. I will have to look at my e-mail. But it was verbally expressed to Mr. Blom 5 percent, and 5 percent to Mr. Reichard."

> Q. What did Mr. Jacobsen get for the investment that he gave to you?
> A. 20 percent of Zeal Rewards, LLC.
> Q. Who owns the 80 - the other 80 percent?
> A. I own 70, Chris Reichard owns 5, and Galen Blom owns 5.
> . . . . . . . . .
> Q. . . . [O]wnership in what?
> A. In Zeal Rewards.
> Q. What is Zeal Rewards?
> A. Zeal Rewards is an intellectual property that is an app that is a rewards program.
> Q. Is it a corporation? Is it an LLC? Is it a partnership? Is it a sole proprietorship? What kind of business entity is Zeal Rewards?
> A. At the time it was a d/b/a, and the d/b/a was then – we were going to convert that d/b/a into an LLC. . . .
> Q. As a 70 percent owner, couldn't you [create] the LLC without anybody else's involvement?
> A. Yes.
> . . . . . . . . .
> Q. As [you] sit here today, do you agree that Mr. Jacobsen owns 20 percent of Zeal Rewards?
> A. Yeah. . . . [M]y understanding is that if he completed his financial obligations, he would own 45 percent. But I believe he owns 20 percent now until he completes his obligation.
> . . . . . . .
> A. [I]f he agreed to put the 50,000 to fund Trip Mine -- he had 20 in Zeal -- I agreed to match it and give him 45 in Zeal, so we'd have 45 together. They'd -- he'd have both 45 in both properties.

Doc. 40-2 at 7-8, 12.  Later in his deposition, Beardmore testified that Jacobsen did not currently

own any share of the App, on grounds that the LLC did not exist at the time of the agreement and

Beardmore had not formally assigned the App to the LLC.

> Q. What documentation do you have to support that you are one of the owners of
> the app?
> A. That I created it and that I was going to transfer the app to the LLC once we
> had agreed upon that transfer, once he had completed his part in the financial
> process and we agreed on the LLC, I would then assign the app to the LLC. So, I
> owned the app until we agreed on the LLC.
> ………
> Q. And no dispute that he owned -- in your mind, at least, that he owns 20
> percent?
> A. 20 percent of the LLC Zeal Rewards.
> Q. In the absence of the formation of an LLC, what does Mr. Jacobsen own?
> A. Nothing.
> Q. So, does he own 20 percent of the rights in the app?
> A. No.
> Q. So, how -- how does his investment get counted?
> A. He invested in 20 percent ownership in an equity position in the Zeal Rewards
> LLC. Once we agree on that document and we form the LLC and it's filed with
> the State of Texas, I would transfer the proprietary intellectual property rights of
> Zeal Rewards into that LLC.
> Q. So, as we sit today, Mr. Jacobsen owns nothing, and he's out $50,000?
> A. Yes.
> ………
> Q. What did Mr. Jacobsen get for that 5,000-dollar investment?
> A. 25 percent -- he got 45 percent ownership in the LLC of Zeal Rewards once
> the properties were transferred into the LLC. He gets nothing until he completes
> the LLC. I own 100 percent of all properties.

Doc. 40-2 at 15-16, 18.  In an email to Beardmore, Jacobsen claimed that he, rather than

Beardmore, owned 100% of the App and that he had intended to assign it to the yet-to-be-formed

LLC.

> First, no agreement was ever reached with regards to Zeal Rewards, LLC. Only
> discussions as to what a POTENTIAL DEAL may look like. TO DATE no
> agreement has been reached. All that exists with Zeal Rewards, LLC is a
> governing document which states you and I are co managers with no contribution
> of intellectual property to the entity. With that said, as you know I own the App
> Zeal Rewards personally and was going to contribute that into an entity once a
> final agreement was reached and the appropriate documents executed as outlined

in the operating agreement I provided you. TO date, all checks have been written
by me to you and others to develop the app for me. I own the app personally as
reflected in the Apple developer site. I own & control all property, I'm on the
checking account, wufu account, paypal account.

Doc. 43-5 at 1-2. On June 6, 2012, Jacobsen, filed an LLC certificate, listing Jacobsen and

Beardmore as co-managers. Doc. 43-4. No assets were assigned.

Reichard developed the App between July and October, 2012, submitting three versions

to Jacobsen's "iTunes Connect" account before it was accepted for sale in the Apple Store on

October 31, 2012. Doc. 4-2. The App was available to the public for five weeks as a free "beta

version." At the time of the launch, the parties had signed up six businesses: Just Burgers,

Bedrock City Comics, Drew's Pastry Place, and The Rib Tickler. Doc. 29-3 at 75. After five

weeks, twelve businesses and 220 users had signed up. *Id.* Beardmore's testimony is unclear as

to whether any of the users paid for the App.

> Q. Did anybody ever pay you $20.00 a month?
> A. The Rib Tickler did pay us, yes.
> ……..
> Q. This app made actual 20 bucks?
> A. No, sir, it did not make –
> Q. What was the total amount of money that the Z.E.A.L. Rewards app made?
> A. Zero.
> Q. What was the total amount that people paid to use it?
> A. $20.00 a month.
> Q. Total amount in pocket?
> A. Zero.
> Q. Okay. So nobody ever paid?
> A. No, sir. They agreed to sign the contract and in exchange for payment starting
> in January for a year's contract.

Doc. 29-3 at 20-21

> Q. Okay. I'm asking do you have personal knowledge or expert witness
> knowledge of 12-month signed contracts with these four businesses?
> A. I would have to look in my storage. I don't know, no, sir.

Doc. 29-3 at 20

In November 2012, Jacobsen emailed Beardmore a draft LLC agreement. Doc. 40-1 at 42. Beardmore objected to the management provisions. Doc. 40-1 at 12, 14 ("He wanted Grant, a friend of his, to be a part of the managers of the LLC. . . . I suggested to Mr. Jacobsen to add Galen and Chris Reichard. He objected and said no because then it would be a disproportion of my friends."). The parties held a meeting at Panera Bread to review a paper copy of the draft and to resolve the impasse; Beardmore crossed off Denham's name, added Blom and Reichard in pen, and refused to sign. *Id.* at 15, 42–43  ("I refused to sign the document because I wanted to have an attorney look at it and advise me. It wasn't – I did not have any disagreements with Jacobsen until I had an attorney look at it."). On December 6, 2012, he emailed Jacobsen:

> As I stated on the phone, my attorneys have advised me not to sign the document.
> .......
>  I know you have invested in me, Galen and Chris at present $65,000 almost $70,000 of the $100,000 committed by you for the 45% equity position in Zeal Rewards, LLC in the hope that your investment will be a great financial opportunity and successful business for us all…we believe this is still possible. Nothing has changed...except the proposed Zeal Rewards, LLC document concerning proposed man[a]ger candidates and financial payback allocations.
> .......
> Myself, Galen and Chris will be the managers of Zeal Rewards, LLC and you as well. Grant Denham will not be a man[a]ger.

Doc. 43-5 at 2–3.  Jacobsen responded:

> We were working towards a deal, but because of your lack of business acumen I have decided to take ZEAL REWARDS THE APP a different direction and hereby no longer need your services.
> ......
> Also you will be advised I have terminated your access to my iTunes Developer account and hereby request you and others no longer work on this project for me and no longer are authorized to access any website or any other property I own with regards to this matter.

Doc 43-5 at 2.  On December 7, 2012, Jacobsen sent him a text message: "Just FYI I took app down n can't be downloaded from apple so no one can download at beta sites till my new team corrects all the problems u gu[y]s could not resolve." Doc. 43-6. The next day, Jacobsen texted:

"Hey I have an offer to sell the app which I will accept unless u get the funds by wed[.] I shut the bank account down and will shut PayPal toll free number and wufu on Monday." *Id.* Beardmore replied by email: "Jim, the Zeal Rewards App is not your intellectual property. It is mine. I don't agree or authorize you to sell it!" Doc. 43-5. On December 12, 2012, Jacobsen emailed Reichard:

> I am expecting to close on the sale of ZEAL Rewards APP on Friday. I need to discuss/secure the database & coding and have you work with the acquisition company on transitioning the app to them. In addition, i need you to put together an invoice with your detail time and rates for the time spent on the app so that it can get paid at closing.

Doc. 6-3. On December 13, 2012, he emailed again: "Chris, let me know asap . . . . otherwise we both will incur attorneys fees to get this done." Doc. 6-5. Jacobsen emailed Reichard:

> Chris, As you are aware the Zeal Rewards App Project is on hold. In addition, you know the App is in my legal name in which I paid you and Patrick to help develop the app. At this time, you are hereby instructed to halt all further development on the app. and make to changes to help or hurt to current development state of the APP. You are also hereby instructed to no longer have contact with anyone else other than myself in regards to the Zeal App otherwise I will take immediate and decisive legal action against you / Stratopy. In addition, you are currently in default on the development of trip mine app which we need to have my funds returned immediately. I have received an offer from a company in CA that wants to take over the app. I will contact you next week about transferring the data / programming files to them. Again, you are not to refile the APP with apple or take any further action or contact with anyone regarding this matter. My attorneys are drafting a formal notification to you on the transfer of my files. We have also notified Apple in regards to this matter.

Doc. 43-11. Jacobsen texted Beardmore: "I've contacted apple to make sure app not resubmitted under another developer I filed an affidavit w them to prove up my ownership and[.]" Doc. 43-12.

On December 13, 2012, Plaintiffs' counsel, John Leger, sent Jacobsen a demand letter requesting contact within ten days and advising that he held a power of attorney that assigned him a portion of any claim. Doc. 43-13. On January 5, 2013, Jacobsen texted Beardmore:

> Just FYI just got back from la n sold zeal for 500k
> Not bad
> U think [Leger] has any stroke…. Wrong
> Cash in hand n sold done deal
> Good luck
> Developers redoing app n site
> Should have taken my offer

Doc. 43-12. On January 8, 2013, Jacobsen texted:

> Ok $1mm damn I made some $$
> Lol
> Not

Doc. 43-12. On February 12, 2013, Plaintiffs filed the instant suit, alleging Jacobsen "sold the

'APP' to unnamed parties for one million [$1,000,000] dollars. Such sale was made on or about

January 8, 2013." Doc. 1 at 2.   On February 18, 2013, Jacobsen emailed Leger:

> I tried to contact you a number of times last week and earlier today without you
> responding back to my requests. I left multiple messages at your offices with both
> your voice mail and with your assistant.
>
> I received your Notice of a Lawsuit filed against me, personally, James Jacobsen.
> In regards to this matter I have the following comments:
>
> 1. The Zeal Rewards has not been sold, nor has not been marketed to be sold, or
> otherwise disposed of in any manner by me. I have no idea why you and your
> clients would make that representation on a formal court filing without any proof
> as to this?

Doc. 43-14. Beardmore testified he was not informed of the contents of the email.

> Q. Did Mr. Leger tell you on February 18, 2013, upon receipt of the lawsuit, Mr.
> Jacobsen had informed him that the app hadn't been sold?
> A. He told me that Mr. Jacobsen had given contrary statements and lied in his
> affidavit.
> …….
> Q. Were you informed that Mr. Jacobsen, on February 18th, 2013, had told your
> lawyer that the app hadn't been told?
> A. No.
> Q. If you had been, would you continue to be pursuing this lawsuit today?
> A. No.

Doc. 40-2 at 15. On March 13, 2013, Jacobsen filed a motion to dismiss with an affidavit denying that a sale had occurred.  Doc. 4-1 at 2 ("The APP has not been sold, nor has it been offered for sale to any individual or entity."). On April 2, 2013, Beardmore responded with an affidavit stating: "Based upon the text-messages and emails sent to me by Mr. Jacobsen, I believe that he has taken over my 'APP', sold it [f]or $500,000.00, kept the money, and had the APP changed in some unknown way." Doc. 6 at 2-3.

On March 3, 2013, Jacobsen moved to dismiss under Rule 12(b)(1) and 12(b)(6). Doc. 4. On July 14, 2014, the Court denied the 12(b)(1) motion because (1) "Plaintiffs' claims  arise under the Copyright Act" and (2) Jacobsen's "factual challenge to the Court's subject matter jurisdiction is insufficient to support dismissal." Doc. 18. The Court granted in part Jacobsen's 12(b)(6) motion, dismissing the copyright infringement claim without prejudice for failure to allege compliance with the Copyright Act's registration requirement, 17 U.S.C. § 411. The Court granted Plaintiffs twenty days to amend their complaint to comply with § 411. The Court denied Jacobsen's 12(b)(6) motion on the state-law claims. On August 15, 2014, Jacobsen counterclaimed against Plaintiffs for a declaratory judgment that Zeal is jointly owned or for damages for breach of contract. Doc. 19 at 6. On August 18, 2014, Plaintiffs filed an amended complaint with documents to show copyright registration. Doc. 20.

## II.   Legal Standard

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over such a fact is genuine if the evidence presents an issue "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). Initially the moving party bears the burden of identifying

evidence that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmovant bears the burden of proof at trial, the movant need only point to the absence of evidence supporting an essential element of the nonmovant's case; it does not have to support its motion with evidence negating the case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). The nonmovant then can defeat the motion for summary judgment only by identifying specific evidence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248–49.

## III.    Discussion

Plaintiffs assert four claims: (1) conversion, (2) violations of the Texas Theft Liability Act, (3) trade secret misappropriation, and (4) copyright infringement. Doc. 1; Doc. 20. Jacobsen asserts two counterclaims: (1) declaratory judgment as to ownership; and, alternatively, (2) breach of contract causing damages of $70,000. Doc. 19 ¶¶ 7–10.

### A.    Conversion

Under Texas law, conversion is "unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights." *Carson v. Dynegy, Inc.*, 344 F.3d 446, 456 (5th Cir. 2003) (quoting *Waisath v. Lack's Stores*, 474 S.W.2d 444, 447 (Tex. 1971)). When an "allegation involves only intellectual property rights . . . rather than rights regarding physical property . . . [it] is outside the scope of Texas conversion law, which concerns only physical property." *Id.*[1] Intellectual

---

[1] A few courts have allowed trade secret misappropriation claims styled as conversion claims. *Cuidado Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care Servs., LLC*, 404 S.W.3d 737, 749 (Tex. App.—El Paso 2013, no pet.) ("The taking of a party's confidential client list and trade secrets can be the basis for a conversion claim."); *Deaton v. United Mobile Networks, L.P.*, 926 S.W.2d 756 (Tex. App.—Texarkana 1996), *rev'd on grounds of insufficient damages*, 939 S.W.2d 146 (Tex.1997) (same); *Chandler v. Mastercraft Dental Corp. of Tex., Inc.*, 739 S.W.2d 460 (Tex. App.—Fort Worth 1987, writ denied) (conversion of "patterns, molds, castings" as well as a "whole system of processing and manufacturing" an orthodontic chair). *But see Xpel Technologies Corp. v. Am. Filter Film Distributors*, CIVA SA-08-CA175-XR, 2008 WL 3540345, at *6 (W.D. Tex. Aug. 11, 2008) ("[T]he Court explicitly rejects the assumption in *Chandler* that conversion of trade secrets is a cognizable claim under

property rights are largely the province of federal law, and the Fifth Circuit has expressly held state law claims such as conversion "based on ideas fixed in tangible media" are preempted by the Copyright Act. *Spear Mktg., Inc. v. BancorpSouth Bank*, 791 F.3d 586, 597 (5th Cir. 2015). Courts have likewise denied claims of conversion of a trademark, *Neles-Jamesbury, Inc. v. Bill's Valves*, 974 F. Supp. 979, 982 (S.D. Tex. 1997), and conversion of trade dress, *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1569 (S.D. Tex. 1996), *aff'd as modified*, 155 F.3d 526 (5th Cir. 1998).

Texas recognizes a limited exception to the tangibility requirement, allowing conversion of intangible rights embodied in or "merged" with unique paper documents. *Prewitt v. Branham*, 643 S.W.2d 122, 123 (Tex. 1982) (allowing conversion of assignment of lease that appeared to have been forged; "[t]he conversion of [a lease] document in which the rights had been merged supports a conversion action for the value of the rights represented by it"); *Watts v. Miles*, 597 S.W.2d 386, 387 (Tex. Civ. App.—San Antonio 1980, no writ) (certificated shares withheld in breach of contract); Restatement (Second) of Torts § 242 (1965) ("Where there is conversion of a document in which intangible rights are merged, the damages include the value of such rights.").

Here, Plaintiffs assert conversion of an iPhone application "consist[ing] of tangible property created and constructed by Plaintiffs at great expense in time, labor, skill, and money." Doc. 1 at 3; Doc. 43 at 12-16.   Plaintiffs allege Jacobsen converted the App by:

> (1). selling the 'Zeal App' which he did not own
> .
> (2). causing the 'Zeal App' (he did not own) to be

---

Texas law. Such assumption neither comports with the reasoning of the majority of Texas courts nor logically is reconcilable with the elements required to prove conversion."); *In re Simons Broad., LP*, CIV. W-11-CA-172, 2013 WL 9542015, at *13 (W.D. Tex. Nov. 19, 2013) ("[T]he Court declines to depart from the interpretation of Texas law shared by the majority of Texas courts and the Fifth Circuit, and holds that conversion applies only to physical property under Texas law.").

modified.

(3). removing 'Zeal App' from 'App Store' so it could not be used;

(4). claiming to third-parties, *to wit*, Chris Reichard, that he owns the 'Zeal App.'

(5). threatening to bring immediate and decisive legal-action against a third-party; *to wit*: Chris Reichard and his company if he even contacted anyone about the Zeal Rewards App.

(6). offering to sell the Zeal App to unknown third-parties.

(7). contacting the Apple App Store and taking action to guarantee the Zeal App was not re-submitted by someone else.

(8). signing an Affidavit at the Apple Store swearing that he owns the Zeal App when in fact he does not.

(9). claiming in this Court that he is the owner or part-owner of the Zeal App when he is not.

(10). claiming exclusive ownership of the Zeal App and refusing Complainant's access to the Zeal App. and,

(11). refusing to permit Complainants to have access to the Zeal App without the payment of money.

Doc. 43 at 15 (citations to exhibits omitted).  All of the foregoing allegations concern only intellectual property, the Zeal App, rather than physical property.

In the Response, Plaintiffs argue, "[T]he idea of the Zeal Rewards App was merged with computer-code, drawings, diagrams and other written material constituting components of the Zeal App." Doc. 43 at 12–13.  The record includes two written materials that plausibly represent "components" of Zeal: (1) the pitch deck sent to Jacobsen, Doc. 42-1; and (2) a booklet submitted to the U.S. Copyright Office after the suit was filed. Doc. 20-5. The documents are not the sort of paper certificates or documents embodying ownership rights to which courts have

applied the doctrine of merger; nor do they contain the sort of client lists and other trade secrets that some Texas courts, erroneously or not, have found supported conversion claims. *See supra* n.1. Plaintiffs have not alleged the documents were physically converted; the booklet did not exist at the time of the alleged conversion, and the pitch deck was voluntarily transferred to Jacobsen by Beardmore by way of an email. *See Quantlab Techs. Ltd. (BVI) v. Godlevsky*, 719 F. Supp. 2d 766, 778 (conversion did not apply to information taken from employer on hard disk where the hard disk neither merged with the information nor belonged to the employer); *Pebble Beach*, 942 F. Supp. at 1569 (conversion did not apply to trade dress captured by defendant on videotape); *see also In re Mud King Products, Inc.*, 514 B.R. 496, 516 (Bankr. S.D. Tex. 2014) (denying a claim of conversion of information contained in diagrams; "to the extent [claimant] seeks recovery for the paper copies themselves, it has not proven conversion by Mud King because [claimant] was never deprived of possession of the information or its own ability to possess the data"); *Spear*, 791 F.3d at 598 (denying a claim of conversion of "certain physical property, documents, and confidential information" pertaining to a computer program and "certain trade secrets pertaining to proprietary ideas, processes, and/or other methodologies of [computer program] . . . to the extent it alleges conversion of intangible 'confidential information' and 'certain trade secrets.'"). Conversion does not apply to Jacobsen's alleged acts in connection with Zeal, which are more properly considered in relation to their trade secret and copyright claims.

The record shows Jacobsen unilaterally closed Zeal's checking account, PayPal account, "wufu" account, and toll-free telephone account; and changed the password to the iTunes account. Docs. 43-5, 43-6. Although conversion requires assumption and control of tangible property, "it is not necessary that there be a manual taking of the property in question." *Waisath*,

474 S.W.2d at 447. Conversion may apply to specific money in a bank account "when its identification is possible and there is an obligation to deliver the specific money in question or otherwise particularly treat specific money." *Houston Nat. Bank v. Biber*, 613 S.W.2d 771, 774 (Tex. Civ. App.—Houston [14th Dist.] 1981, writ ref'd). Bank accounts "generally cannot be the subject of conversion, because they are not specific money, but only an acknowledgment by the bank of a debt to its depositor." *Reliance Ins. Co. v. U.S. Bank of Washington, N.A.*, 143 F.3d 502, 506 (9th Cir. 1998). Plaintiffs have not shown the accounts closed by Jacobsen contained "specific money." Rather than conversion, Plaintiffs allegations as to the closed accounts only support a claim of breach or tortious interference with their rights to the accounts. Such claims require proof of "actual damage or loss." *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997) (elements of tortious interference); *see Ctr. Equities, Inc. v. Tingley*, 106 S.W.3d 143, 154 (Tex. App.—Austin 2003, no pet.) ("[N]ominal damages are not recoverable for a tortious interference claim."). Beardmore admitted Jacobsen was the only investor who "put dollars, money, into the Zeal project," by writing personal checks to Beardmore and Reichard. Docs. 29-3 at 74. Beardmore testified, "I put some of my money into it, but I don't recall how much, just personal money." Doc. 40-2 at 31. There is no evidence that Plaintiffs had money in the closed accounts or that they were deprived of money due to Jacobsen's closing the accounts.

### B. Theft

Under the Texas Theft Liability Act ("TTLA"), a person who commits theft is liable for damages resulting from the theft. Tex. Civ. Prac. & Rem. Code § 134.002(3). "The TTLA provides victims of a theft, as defined in various sections of the Texas Penal Code, with a civil action to recover damages, fees, and costs from the thief." *In re Powers v. Caremark Inc.*, 261

Fed. App'x 719, 721 (5th Cir. 2008). Plaintiffs assert (1) theft, Tex. Penal Code Ann. § 31.03 (West 2015), and (2) theft of trade secrets, Tex. Penal Code Ann. § 31.03 (West 2015).

A person commits the offense of general theft if the person appropriates property without the owner's effective consent, with intent to deprive the owner of property. *Id.* § 31.03(a)-(b). A person commits an offense of theft of trade secrets if, without the owner's consent, the person knowingly "(1) steals a trade secret; (2) makes a copy of an article representing a trade secret; or (3) communicates or transmits a trade secret." *Id.* § 31.05(b). Trade secrets under the TTLA, as under the Uniform Trade Secrets Act and the common law, consist of valuable secret information. Tex. Penal Code § 31.05 ("'Trade secret' means the whole or any part of any scientific or technical information, design, process, procedure, formula, or improvement that has value and that the owner has taken measures to prevent from becoming available to persons other than those selected by the owner to have access for limited purposes."). Unlike conversion, theft under the TTLA does not have a tangibility requirement[2]; but theft of intangible property that is a "trade secret" must be asserted as theft of trade secrets under § 31.05 and not general theft under § 31.03. *Falcone v. State*, 682 S.W.2d 418, 421 (Tex. App.—Houston [1st Dist.] 1984, no pet.) (reversing conviction on grounds that defendant was incorrectly charged with theft rather than theft of trade secrets) (citing *Ex parte Harrell,* 542 S.W.2d 169 (Tex. Crim. App. 1976); Code Construction Act, Tex. Gov't Code Ann. § 311.026 (special provisions prevail)). In any event, general theft has been held to apply only to unique documents and not copies of documents. *Id.* (taking copies did not "deprive" owner of documents); *Joe N. Pratt Ins. v. Doane*, CIV.A. V-07-07, 2008 WL 819011, at *13 (S.D. Tex. Mar. 20, 2008) (same).

---

[2] "It is interesting to note that although Texas is one of the strictest jurisdictions in its tangibility requirement in the conversion context, it is also among the states that liberally allow theft to apply to all intangible personal property. Tex. Penal Code Ann. §31.01(5)(B)." Courtney W. Franks, *Analyzing the Urge to Merge: Conversion of Intangible Property and the Merger Doctrine in the Wake of Kremen v. Cohen*, 42 Hous. L. Rev. 489, 521 n.231 (2005).

Plaintiffs allege, "The 'APP' in question consists of tangible personal property created and constructed by Plaintiffs at great expense in time, labor and money. This property was unlawfully appropriated, secured or stolen from the plaintiffs pursuant to [§ 31.03 and § 31.05]." Doc. 1 ¶ 7. The only "tangible" aspects of Zeal evinced in the record are the pitch deck and the booklet, which were not taken from Plaintiffs without consent, nor with intent to deprive. General theft does not apply.

The Fifth Circuit has held theft of trade secrets under § 31.05 as applied to software is preempted by the Copyright Act. *Spear*, 791 F.3d at 598. The plaintiff in *Spear* alleged the defendant "stole . . . physical property, documents, and confidential information"; "copied objects, materials, devices or substances, including writings representing [plaintiff's] confidential information"; and (3) "communicated and transmitted [plaintiff's] confidential information." 791 F.3d at 598. The court applied the two steps of 17 U.S.C.A. § 301 to determine if the claim was preempted. 17 U.S.C.A. § 301 ("[A]ll legal or equitable rights that are [1] equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in [2] works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103 . . . are governed exclusively by this title"). First, the claim fell within the subject matter of copyright, because the alleged trade secrets related to software; and "computer software is a tangible medium protected by the Copyright Act." *Id.* 597. More precisely, the information alleged to have been stolen was all "'fixed,' so to speak, in the VaultWorks software user interface." *Id.* The "crux" of the case was theft by "enticing [plaintiff] to perform a demo of its software" and "receiving screenshots of VaultWorks" during the implementation of a competing program, during which time the information "appeared in a tangible medium." *Id.* Second, the court found the claim asserted

equivalent rights as copyright: "Copying, communicating, and transmitting are equivalent acts to reproducing and distributing." *Id.* (citing 17 U.S.C.A. § 106 (listing rights protected under copyright)). Under *Spear*, civil liability for theft of trade secrets under § 31.05 applies only to an elusive class of unrecorded yet valuable secrets.[3]

Here, Plaintiffs claim, "The Defendant Sold Their Intellectual Property! In doing so, Defendant made *unauthorized copies* of Plaintiff's 'ZEAL App' and TRANSMITTED a COPY of the App to *unknown* Third-Parties, and then, caused the App to be 'redone!'" Doc. 43 at 18, emphasis in the original. Plaintiffs reiterate their eleven allegations of conversion, *supra* III.B, including four relevant allegations: (1) removal of Zeal from the App Store, (2) "taking action to guarantee" Plaintiffs did not re-submit it, (3) "causing [Zeal] to be modified," and (4) selling or offering to sell Zeal. Doc. 43 at 15. Applying the two steps of preemption, following *Spear*: (1) all of the alleged acts concern information contained entirely within Zeal, a copyrightable software program; (2) all of the alleged acts, to the extent they constitute acts prohibited by § 31.05 (stealing, copying, and communicating or transmitting trade secrets), correspond to exclusive rights under copyright. Plaintiffs' theft of trade secrets claim is preempted by the Copyright Act.

### C. Misappropriation of Trade Secrets

"Trade secret misappropriation under Texas law is established by showing (a) a trade secret existed; (b) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (c) use of the trade secret without authorization from the plaintiff." *Spear*, 791 F.3d at 600. Trade secret misappropriation is not preempted, because it

---

[3] Since this case was filed, the Texas Legislature has adopted the Uniform Trade Secrets Act ("UTSA"), Tex. Civ. Prac. & Rem. Code Ann. § 134A.002 (West 2015), and amended the TTLA by removing § 31.05 from the definitions of theft covered by the statute. 2013 Tex. Sess. Law Serv. Ch. 10 (S.B. 953) (West). The UTSA also expressly displaces the tort of trade secret misappropriation. The UTSA only applies to theft of trade secrets occurring on or after September 1, 2013, so Plaintiffs' theft and misappropriation claims are not affected. *Id.*

includes an "extra element" of breach of confidentiality or improper methods, which is not equivalent to any of the exclusive rights of copyright.[4] *M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 786 (S.D. Tex. 2010) (no preemption); *GlobeRanger Corp. v. Software AG USA, Inc.*, 3:11-CV-0403-B, 2015 WL 3648577, at *4 (N.D. Tex. June 11, 2015) (same); *Stromback v. New Line Cinema*, 384 F.3d 283, 303 (6th Cir. 2004) (collecting cases). The Fifth Circuit has not applied the two-step preemption test to trade secret misappropriation. *Spear*, which tested conversion and TTLA trade secret claims and found both preempted, dismissed a trade secret misappropriation claim under Rule 12(b)(6) without considering preemption. 791 F.3d at 602; *see also Computer Management Assistance Co. v. Robert F. DeCastro, Inc.,* 220 F.3d 396, 404–05 (5th Cir. 2000) (Louisiana Unfair Trade Practices Act claim not preempted).

Plaintiffs claim Jacobsen misappropriated Plaintiffs' property by (1) "selling the 'APP' to unnamed parties," and (2) "causing the same or other unnamed parties to make un-authorized copies of the components of the 'APP' programs." Doc. 1 ¶ 8. The "components of the 'APP' programs" consisted of "drawings, prints, devices, flow-charts, software architecture, and other tangible property related thereto" provided to Jacobsen "at his request for the sole purpose of determining the extent, if any, of his financial participation in the entity to be created." *Id.* The only document fitting this description is the pitch deck that Beardmore emailed to Jacobsen. Doc. 40-3 at 2.

Jacobsen's receipt of the pitch deck does not satisfy the elements of trade secret misappropriation. First, Plaintiffs have not identified trade secrets in the pitch deck. To determine whether a trade secret exists, Texas courts apply a six-factor test:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3)

---

[4] Trade secret misappropriation has been expressly displaced by the USTA, which provides a comparable action for misappropriation. Tex. Civ. Prac. & Rem. Code Ann. § 134A.002 (West 2015); *see id*.

the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (quoting Restatement of Torts § 757 cmt. B. (1939)).[5] Claimants do not need to satisfy all six factors, because trade secrets "do not fit neatly into each factor every time." *Id.; see Cataphote Corp. v. Hudson*, 422 F.2d 1290, 1293 (5th Cir. 1970) ("An item or process of public or general knowledge in an industry cannot be appropriated by one as his own secret."); *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 201 (5th Cir. 1984) ("That which is readily visible and ascertainable cannot constitute a trade secret."); *see also T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd) ("[M]arket strategies, blueprints, and drawings have been shown to be trade secrets."). *Cf. Global Water Group, Inc. v. Atchley*, 244 S.W.3d 924, 929-30 (Tex. App.—Dallas 2008, pet. denied) ("[T]he mere fact that knowledge of a product may be acquired through inspection and analysis does not by itself preclude trade secret protection. Nevertheless, it is a relevant consideration in determining whether information was actually a secret.").

Here, the seven screenshots and paragraph of text about Zeal's functionality included in the pitch deck were readily ascertainable from the App itself, which was available to the public for free at the time of the alleged misappropriation. The pitch deck also includes a timeline with milestones, *e.g.* Doc. 42-1 at 13 ("June–August 2012, Beta Test Zeal Rewards in 5 communities: Tomball, Woodlands, Champions, North Houston and Cypress"); a brief description of its target market, *id.* at 9 ("Our ideal business caters to customers from age 16 to 35 and offers a product or service that is regularly purchased. For example, apparel, bakeries, bar & grill, restaurants &

---

[5] The UTSA, Tex. Civ. Prac. & Rem. Code Ann. § 134A.002, and Tex. Penal Code § 31.05 (theft of trade secrets) provide statutory definitions of trade secrets. *See supra* n.3.

salons ... etc. These types of companies are all around high schools, college campuses and trendy urban areas."); a list of revenue sources, *id.* at 10 ("1. Sales Affiliate (Start Up Fee $300/ $50 Month), 2. Loyalty Program (Annual Service Agreement: $299 - $599), 3. Advertisements (Dashboard, Categories & Call To Arms), 4. In-app Purchases (Skins $2.99)"); a list of "challenges" posed by traditional loyalty cards, *id.* at 7 ("1. They are difficult to change once manufactured. 2. They are costly to print. 3. They are slow to produce and ship. 4. They are inconvenient to distribute and cumbersome to carry."); and the "solution" of Zeal, *id.* at 8 ("1. It's Digital: No cards to print, distribute or store. 2. It's Affordable: (Small Annual Setup Fee). 3. It's Fast: 10 Minute online activation process. 4. It's Simple: QR Code scan to validate. . . . 1. Zeal attracts 'NEW CUSTOMERS' by making loyalty FUN!. 2. Zeal rewards returning customers for their 'LOYALTY'."). Plaintiffs have not provided evidence supporting relevant, albeit nonmandatory, factors of "ease or difficulty with which the information could be properly acquired or duplicated by others" and "the amount of effort or money expended by him in developing the information." *In re Bass*, 113 S.W.3d at 739. Beardmore testified in August 2014 that he had "no idea" how many loyalty rewards apps were on the market in 2012 and that he based his valuation for damages on an internet search on the Google, MSN, and Yahoo search engines. Doc. 29-3 at 114, 123. The pitch deck does include a confidentiality disclaimer intended to safeguard the secrecy of the information. Since Plaintiffs have failed to satisfy the remaining elements of trade secret misappropriation, it is not necessary to resolve whether the information in the pitch deck comprises trade secrets. Plaintiffs have not shown either that the pitch deck was "acquired through a breach of a confidential relationship or discovered by improper means" or that it was used without authorization. *Spear*, 791 F.3d at 600. It was acquired from Beardmore,

who voluntarily sent it by email, and there is no evidence it was shared with anyone else. Plaintiffs' trade secret misappropriation claim as to the pitch deck fails.

Plaintiffs allege Jacobsen misappropriated trade secrets by "selling the 'APP' to unnamed parties." Doc. 1 ¶ 8. Beardmore declares he "believes" Zeal was sold "based upon the text-messages and emails" sent to him by Jacobsen. Doc. 6 at 2. In Jacobsen's deposition, Plaintiffs' counsel stated: "For purposes of this case, I'll concede that you haven't sold the app." Doc. 40-3 at 139. Beardmore has submitted one text message saying Zeal was sold. Doc. 43-12 ("[S]old zeal for 500k . . . Not bad . . . Cash in hand n sold done deal . . . Should have taken my offer"). Jacobsen texted him again three days later claiming he sold Zeal for double the previous price, although the text arguably suggests he was joking. *Id.* (Ok $1mm damn I made some $$ . . . Lol . . . Not"). Plaintiff has also submitted an email sent three weeks earlier by Jacobsen, threatening to sell Zeal, Doc. 43-5 at 1 ("If you want to buy it I suggest you get me enough money to buy it from me. Otherwise I am moving forward with selling it to recoup my costs and i should be closing by this Friday. I have already started with the purchase & sale agreement."); and two emails to Reichard, Doc. 6-3 ("I am expecting to close on the sale . . ."); Doc. 43-11 ("I have received an offer from a company in CA that wants to take over the app."). Given the absence of any evidence of a sale besides Jacobsen's texts, Plaintiffs have not raised a genuine issue of fact whether Zeal was sold.

Jacobsen's unauthorized removal of Zeal from the Apple Store in order to compel Plaintiffs to relinquish control of Zeal suggests improper "use." "The word 'use' . . . has been liberally defined to include both the sale of the trade secrets themselves, as well as the 'commercial operation' of those trade secrets within profit-seeking endeavors." *Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 Fed. Appx. 259, 265 (5th Cir. 2014). Extrapolating from the Texas

Supreme Court's adoption of the Restatement of Unfair Competition's definition of trade secrets in *In re Bass*, the Fifth Circuit has found the following definition of use "helpfully expands" on the ambiguous notion of "use" under Texas law:

> As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use" under this Section. Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret.

*Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 450 (5th Cir. 2007) (quoting Restatement (Third) of Unfair Competition § 40 cmt. c (1995)).

The record shows Jacobsen removed Zeal from the Apple store and instructed Reichard not to create a new version. Jacobsen has submitted a screenshot of the iTunes developer account for Zeal, showing it was uploaded on October 22, 2012 and removed ("Developer removed from sale") on December 7, 2012 by "jim.jacobsen@me.com." Doc. 4-2. Jacobsen testified he did not personally upload the App. Doc. 40-3 at 88 ("Q. Did you know they put . . . the Z.E.A.L. Rewards on your - on your app store account? A. I'm not a tech person, so I don't know what they did."). Jacobsen's expert explained that "it is easy for anyone" to open an Apple developer account by paying $99. Doc. 40-6 at 5. He explained,

> Given that neither Beardmore or Jacobson claimed to have the skills to create an app and it was stated that third party developers actually coded the app, it is safe to conclude the source code of the Zeal app was always in the hands of the developers and that the developers just used Jacobson's credentials as provided to them in order to submit the actual app using defendant's iTunes Connect account.

Doc. 40-6 at 9. On the day it was removed, Jacobsen texted Beardmore, "Just FYI I took app down n can't be downloaded from apple so no one can download at beta sites till my new team corrects all the problems u gu[y]s could not resolve." Doc. 43-6. Jacobsen testified, "I changed the password to my iTunes account. . . . Because I don't want them looking at my other stuff

that's going on. . . . iTunes is a personal account with personal information above and beyond what's in Z.E.A.L. that I don't want to share with them." Doc. 40-3 at 86. He states in his declaration:

> On March 11, 2013 I accessed the developer account and printed two pages showing the existence of the APP and its status history . . . If a hearing is required on the Motion to Dismiss, I can access the account and demonstrate to the Court and all concerned that the APP remains in the Apple account where it was originally developed.

Doc. 4-1 ¶ 6–7. Beardmore alleges Jacobsen removed Zeal from the Apple Store and changed the password. Doc. 40-1 at 97. ("I tried to log in with my credentials, Jim's credentials, and Chris's credentials. They were all revoked.").

Applying the elements of trade secret misappropriation to Jacobsen's removal of the App, the Court must first determine whether a trade secret existed, i.e. whether the manifestation of Zeal that Jacobsen removed contained trade secrets. Jacobsen's expert explained the copy of Zeal on the Apple Store consisted of "binary object code" rather than "source code." Doc. 40-6 at 9. He further opined,

> It is highly unlikely that a buyer for a new and unproven app in binary only form would pay anywhere near $1,000,000 for the Zeal app as the revenue stream does not come from the app itself, but from the cut of services provided through the app. The binary alone does not provide access to the services infrastructure and any new services infrastructure would require changes in the source code to access them; thus invalidating the binary. . . . [A] case was not made that valued the binary of the Zeal app at anywhere near $l,000,000. It is hard to conceive of the binary alone of the Zeal app having ANY commercial value.

Doc. 40-6 at 9–10. Plaintiffs have not produced any evidence to contradict this opinion.

Courts typically distinguish source code and object code in software copyright cases, in the course of applying an "abstraction-filtration-comparison" test to determine which aspects of a computer program are copyrightable. *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1343 (5th Cir. 1994); *Aspen*, 569 Fed. Appx. at 269. Abstraction, which is derived from

Learned Hand's analysis of a motion-picture play in *Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir. 1930), involves "segmenting a computer program into successive levels of generality," each of which provides independent grounds for copyright. *Eng'g Dynamics*, 26 F.3d at 1343; *see id.* n.10 (citing John W.L. Ogilvie, Note, *Defining Computer Program Parts under Learned Hand's Abstraction Test in Software Copyright Infringement Cases,* 91 Mich. L. Rev. 526 (1992) (listing six levels: "the main purpose, system architecture, abstract data types, algorithms and data structures, source code, and object code"; and noting the absence of "user interface"); *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 143 (5th Cir. 2004) (listing "literal" elements, source code and object code; and "nonliteral" elements, "structure, sequence, organization, user interface, screen displays, and menu structures"). Source code consists of "human readable instructions to the computer in computer language"; whereas object code is "the same set of instructions, but in binary code, viz., the presence or absence of an electrical charge, which may be represented by a series of ones and zeros." 2 Patent Law Fundamentals § 6:14 (2d ed.).

Source code, "which skilled programmers can understand . . . can be understood, altered or misappropriated by unauthorized personnel"; whereas object code is "extremely difficult to de-compile or reverse engineer," enabling developers to distribute it to the public without necessarily revealing the source code. 2 Trade Secrets Law § 9:11. At least one court has found object code contained trade secrets based on restrictive licenses. *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 664 (4th Cir. 1993). The object code had been advertised once in an engineering periodical but was only licensed to two customers on terms that prohibited use "for any purpose other than their own construction or engineering projects"; it only allowed access "using a system of passwords"; and evidence at trial showed the defendant was the only

unauthorized person ever to obtain a copy. *Id.*; *see* 2 Trade Secrets Law § 9:11 ("Cases involving the theft of object codes are rare, so that the extension of trade secret protection to object codes is supported more by logic and reason than by common law precedent."). Source code, however, is usually a trade secret, even though object code derived from it has been distributed to the public. *See, e.g., Aspen*, 569 Fed. Appx. at 267–68 (upholding misappropriation of source code on evidence that it was "undeniably source code," and an expert testified that "access to this code could . . . permit[] [defendant] to create a competing product, save time and resources, and capitalize on gaps in the market.").

Here, the object code for Zeal was publicly available to download from the Apple Store for five weeks. Plaintiffs have not shown they took any measures to maintain its secrecy. Second, they have not shown Jacobsen acquired the object code for Zeal improperly, or that he ever acquired it. They have only shown he removed it. Third, Plaintiffs have not shown he used or exploited it. The record suggests Jacobsen accessed a private developer account and removed the object code from the Apple Store without Plaintiffs' consent in an effort to force them to sign the LLC agreement. In a sense, Jacobsen may have improperly "used" secret information, such as his password or the password-protected instance of Zeal that he removed from the developer account, but not information that was inherently valuable as a trade secret. *See* Restatement (Third) of Unfair Competition § 39 (1995), *cited in In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (trade secrets must be "sufficiently valuable and secret to afford an actual or potential economic advantage over others."); *see also TMX Funding, Inc. v. Impero Technologies, Inc.*, C 10-00202 JF (PVT), 2010 WL 2509979, at *4 (N.D. Cal. June 17, 2010) (plaintiff stated a claim as to trade secret status of "login and password information . . . the only economic value [of which] derives from the fact that it is *not* generally known to others" where password-protected computers were

also alleged to contain "software, source codes, data, formulas, business methods, marketing plans, or margin data"). Plaintiffs have failed to show trade secret misappropriation of the object code for Zeal.

The record suggests Jacobsen may have made fraudulent statements and threats that caused Plaintiffs to cease operating and developing Zeal, to the point that it became obsolete. *See* Docs. 40-6 at 8, 10 (expert opinion that Zeal would likely "stop working or crash" within 1-3 years and would require continual major and minor "versions" to succeed); 29-3 at 22 (Beardmore testimony that Zeal's predecessor, RSVP Local, became worthless when interruption caused loss of market share during negotiations with multiple potential buyers). After removing Zeal from the Apple Store, Jacobsen wrote to Reichard: "[Y]ou are hereby instructed to halt all further development on the app. . . [Y]ou are not to refile the APP with apple or take any further action." Doc. 43-11. Plaintiffs allege he falsely claimed to Apple and Reichard that he owned Zeal, and he attempted to coerce them to buy him out or sign the LLC agreement by removing the App from the Apple Store. Doc. 43 at 15–16.

Plaintiffs, however, have not provided evidence of reliance damages*, Eagle Props., Ltd. v. Scharbauer,* 807 S.W.2d 714, 723 (Tex. 1990) (fraud), lost sales, *A. H. Belo Corp. v. Sanders*, 632 S.W.2d 145 (Tex. 1982) (slander of title), *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013) (interference), or preclusion of the exercise of their free will and judgment, *Dallas County Cmty. Coll. Dist. v. Bolton*, 185 S.W.3d 868, 878-79 (Tex. 2005) (duress).  Beardmore has filed a Designation of Expert Witness, designating himself as an expert on the value of Zeal. Doc. 24. Attached to the Designation is a document dated August 29, 2014 stating: "My opinion: The *Fair Market value* of the ZEAL Rewards app today is at least $1.5 million dollars." Doc. 24-2. The document states that seven iPhone apps "exactly like Zeal

Rewards" had each raised $910,000 in private funding, and two of the apps had each raised $2,200,000. *Id.* In response to Jacobsen's objections as to his qualifications, Beardmore submitted a spreadsheet stating three valuations of Zeal. First, using an "income approach," Beardmore forecasted Zeal's sales from July 2012 to July 2014 (as of July-August 2012) would be $1,145,530, equaling the initial number of people who downloaded the App for free (220), multiplied by $20 per month for 18 months at a monthly growth rate of 40%, based on the growth rate during the free test period. Second, Beardmore wrote, "Replacement estimates are from $100,000 - $250,000," without explanation. Third, using a "market approach," Beardmore estimated Zeal's value was $1.5 million based on transactions involving the seven comparison apps. Attached to the spreadsheet is an opinion letter from an accredited appraiser stating that a market or "Guideline Transactions" approach is "a proper method to use when valuing a business interest or intangible asset." Doc. 24-1 at 6. The letter does not mention Zeal. It explains the market method requires an appraiser to perform a "thorough, objective search" of sales of similar businesses; discount sales prices of each business according to "appropriate underlying financial, operating, or physical data"; and exercise care with respect to "timing of the price data used in the valuation ratios (in relationship to the effective date of the appraisal)." *Id.* Beardmore testified he performed a search for "loyalty" or "punch card" apps on Google, MSN, and Yahoo search engines. Doc. 29-3 at 123. He determined Zeal was worth $1.5 million by adding (1) 10% of the average private funds raised by the seven apps, according to news articles, and (2) 10% of the average of sales prices for the two apps that went public divided by two. Then he divided the sum again by two. He testified the 10% rate was a "fair number" based on an explanation of the market approach on the American Society of Appraisers discount rates were "arbitrary." Doc. 29-3 at 104. "It says you could extrapolate based on sales or any other factors." *Id.* Beardmore's

report is not creditable evidence of actual damages from Jacobsen's actions. Plaintiffs may have filed this suit in reliance, reasonable or not, on fraudulent representations that Zeal had been sold, but they chose not to withdraw when Jacobsen admitted in his answer that no sale had occurred.

### D. Copyright infringement

Plaintiffs allege Jacobsen "caused the transfer and reproduction of the APP to unknown parties without the knowledge, consent, or permission of Plaintiffs." Doc. 1 at 4 (citing 17 U.S.C. §106). This conclusory allegation fails to state a claim of copyright infringement. As explained in reference to Jacobsen's alleged misappropriation of Zeal, Plaintiffs have not shown Jacobsen improperly used the code or written materials constituting Zeal, including by reproducing or transferring it to third parties.

## IV.   Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment, Doc. 40, is **GRANTED.**

SIGNED at Houston, Texas, this 18th day of September, 2015.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE